Elrey John **FERGUSON**, Plaintiff,

v.

The **UNITED STATES of America**, Defendant.

No. C–87–4175 MHP.

United States District Court, N.D. California.

April 24, 1989.

Joseph P. Meyers, Grossman & Davis, San Francisco, Cal., for plaintiff.

John R. Bolton, Asst. Atty. Gen., Joseph P. Russoniello, U.S. Atty., Stephen L. Schirle, Asst. U.S. Atty., Paul F. Figley, Asst. Director, Torts Branch, Civil Div., Julie Zatz, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

PATEL, District Judge.

Plaintiff brought this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2678 and 2680, to recover for injuries sustained in the course of his employment as a private security inspector assigned to premises owned by the United States and leased to Sandia National Laboratories. The case is now before the court on the government's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Having considered the written and oral submissions of the parties, for the following reasons, the court denies the government's motion for summary judgment.

BACKGROUND

Plaintiff, Elrey John Ferguson, was employed by Advanced Security, Inc. ("ASI"), as a security inspector. Ferguson was assigned to work at Sandia National Laboratories in Livermore, California, pursuant to an agreement between Sandia Corporation and ASI.

Sandia National Laboratories is managed by Sandia Corporation, ("Sandia"), a Delaware corporation, pursuant to a contract between the United States Department of Energy ("DOE")[1] and Western Electric Company, Inc., which is now AT & T Technologies, Inc.[2] Sandia was organized in 1949 as a special subsidiary of Western Electric for the purposes of performing research and development for the United States Atomic Energy Commission ("AEC"), now performed for the DOE. Sandia engages exclusively in federally sponsored research relating to atomic energy research and development, receives no fee or profit from the government under its contract, and owns no property except $1,000 in United States bonds that constitutes its paid-in capital.[3]

---

1. DOE is responsible for administration of the nation's research and development of atomic energy. See 42 U.S.C. §§ 2011–2096, 7151.

2. Throughout the rest of this order the contract will be referred to as the "DOE–Sandia Contract."

3. See DOE–Sandia Contract pp. 1, 4. Nevertheless, like other DOE contractors, Sandia is rewarded by the technical and engineering experience it receives from its exclusive work for the government. See Newman, *The Atomic Energy Industry: An Experiment in Hybridization*, 60 Yale L.J. 1263, 1320–25 (1951). Sandia also receives compensation for the cost of employee salaries and other expenditures. See DOE–Sandia Contract pp. 5–6.

The Atomic Energy Commission "management contract" concept derives from the government's efforts to develop atomic weapons during World War II. These cooperative efforts involved the federal government (through the Manhattan Engineering District) and various universities and industrial organizations. The responsibilities of the Manhattan Engineering District were subsequently transferred to the

The DOE requires ongoing training of security personnel at Sandia National Laboratories. Security personnel must participate in classroom training and exercises relating to security procedures at the facility. As part of their work assignments, Ferguson and other security inspectors were also periodically required to take part in security drills and tests. The drills routinely involved mock terrorist "attacks" on the Livermore facility. The drills were designed so that the security force at Sandia National Laboratories would pass performance tests required by the DOE and, if necessary, respond effectively to actual terrorist attacks against the facility.

In 1983, a construction project was commenced near two storage buildings identified as buildings 978 and 979 at the Livermore facility. A fence was erected across a roadway leading to the buildings to prevent construction workers access to sensitive areas of the buildings. The fence consisted of two, seven to eight-foot-high wooden posts, one at each side of the approximately fifteen to twenty-foot-wide roadway. Chain link fence was affixed to the wooden posts with staples and wire.

On October 19, 1985, at approximately 8:00 p.m., Ferguson and several other security inspectors began a training exercise. In the exercise, mock terrorists were presumed to have entered the Livermore premises and set off an alarm in building 978. The exercise was designed to continue until the mock intruders either had been captured or had escaped. Ferguson positioned himself near building 978 in order to maintain surveillance and carry out his team's assignment of "containing" the terrorists inside the building.

During the course of the exercise, Ferguson was told that his group leader had been shot by the terrorists and that he was to take charge. As he moved to a new position, Ferguson proceeded on the roadway that led to buildings 978 and 979. When Ferguson reached the fence described earlier, he climbed to the top and swung his body to the other side. The fence came loose from the wooden posts and collapsed. Ferguson fell to the ground, sustaining injuries for which he now seeks recovery.

## LEGAL STANDARD

Summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

## DISCUSSION

This case concerns the liability of the United States for injuries sustained by a security inspector injured on government-owned property managed by a private contractor. Whether the government is liable

Atomic Energy Commission by the Atomic Energy Act of 1946, ch. 724, 60 Stat. 755 et seq. The Atomic Energy Act of 1946 provided that the AEC would be the sole owner of certain nuclear materials and the facilities used to produce nuclear weapons. The Commission was directed to contract for the operation of these facilities with private parties. This practice was continued under the Atomic Energy Act of 1954, 68 Stat. 921, 42 U.S.C. § 2011 et seq. The contract involved here appears to be typical of the management contracts used by the Atomic Energy Commission, now the DOE. *See* Heistand & Florsheim, *The AEC Management Contract Concept,* 29 Fed. B.J. 67 (1967).

under the FTCA depends on what type of relationship exists between the United States and its contractor Sandia. If Sandia is found to be an independent contractor of the government, then the United States will be immune from suit for the negligence of Sandia under 28 U.S.C. § 2671. The United States will be liable for the negligence of Sandia only if the United States has waived its sovereign immunity, or if Sandia falls within the definition of a "government employee" under 28 U.S.C. § 2671.

The government has moved for summary judgment on three grounds: (1) plaintiff's suit is barred because the DOE's decision to delegate to Sandia the maintenance and security of the facilities at Livermore was a discretionary function, (2) the United States is not liable for the negligent acts of its independent contractors, and (3) the United States owed no duty to plaintiff to ensure that fences built at Sandia National Laboratories would be safe for him to climb.

I. *The Discretionary Function Exception to the Federal Tort Claims Act*

Under the doctrine of sovereign immunity, the government is immune from suits by its citizens, except when the government has given its consent to being sued. *See Dalehite v. United States,* 346 U.S. 15, 30, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953). In 1946, Congress enacted the Federal Tort Claims Act which waived, for the first time, the United States' general immunity from liability in tort for the wrongful or negligent acts of its agents or employees. The FTCA designates the federal courts as the forum for

claims against the United States, for money damages ... for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

The FTCA's waiver of sovereign immunity, however, excludes any claim

based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This "discretionary function" exception, "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 2761–62, 81 L.Ed.2d 660 (1984). The purpose of the exception is to permit the government to make policy judgments without fear of suit. *Berkovitz by Berkovitz v. United States,* — U.S. —, —, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988); *see Camozzi v. Roland/Miller & Hope Consulting Grp.,* 866 F.2d 287, 289–90 (9th Cir.1989) (negligent failure of postal service to discover floor openings in construction project administered by third party is not a discretionary function).

■ The liability of the United States in this case does not turn on the application of this "discretionary function" exception. Plaintiff's claim is not a challenge to the government's decision to delegate the operation of the Livermore facility to Sandia. The liability of the government in the instant case is predicated on the nature of the relationship between the United States and Sandia.

Having determined that the discretionary function exception is inapplicable, the court turns to the government's exculpatory theories based on its contractual relationship with Sandia.

The government contends that Sandia is an independent contractor of the United States for all purposes of the operation of the Livermore facility. Therefore, it argues, Sandia's negligence cannot be imputed to the government, because, as an independent contractor, Sandia is not an "employee" of the United States. *See* 28 U.S.

C. § 2671. Plaintiff contends that Sandia, pursuant to the contract with the United States, acted as the government's agent in the construction and maintenance of the fence which collapsed, as well as in all actions concerning the safeguarding and securing of property, including the hiring and management of ASI, plaintiff's employer.

In this case of first impression, the court reaches its decision based upon an analysis of the contract between the United States and Sandia. Here, the parties have contractually created a principal-agent relationship with respect to maintenance and security at Sandia National Laboratories. The court finds that the United States is liable for the negligent acts of Sandia on two grounds: 1) the government contractually waived its sovereign immunity by designating Sandia as its agent for certain purposes, and 2) the United States authorized Sandia to act on its behalf, making Sandia a "government employee" under 28 U.S.C. § 2671, for whose actions the government is liable. Each ground will be considered in turn.

## II. *Government Liability*

### A. The Waiver of Sovereign Immunity

■ The pertinent contractual provisions establishing the principal-agent relationship in this case appear in Article XX of the contract entitled, "Status and Authority of Sandia Corporation as an agent of the DOE." They state:

> Under the provisions of this Contract, Sandia Corporation has performed as a management contractor of the Atomic Energy Commission and the Energy Research and Development Administration and will continue to perform as a management contractor of the DOE. On the basis of certain provisions of this Contract and the long-standing relationship and practice of the parties hereunder, *it is recognized that Sandia Corporation acts as an agent for and on behalf of the DOE for certain purposes.* Particular provisions and features of the contractual relationship *which establish the agency status of Sandia Corpora-*

*tion* and the extent of the status and authority thereby created include, but are not limited to, the following:

\* \* \* \* \* \*

> Sandia Corporation in the performance of this Contract *acts as the agent of the DOE in the* purchase, lease, or other acquisition, *and in the management, maintenance, protection, safeguarding,* sale, and disposition *of all property* of any kind whatsoever, real or personal, used in the performance of this Contract.

\* \* \* \* \* \*

> The DOE considers all obligations properly incurred in accordance with the provisions of this Contract to be DOE obligations from their inception. Sandia Corporation acts as agent of the DOE in making appropriate payments to all obligees and is responsible for taking any and all other actions as may be necessary for appropriate and timely discharge of all such DOE obligations.

\* \* \* \* \* \*

Article XX concludes:

> The purpose of this article is to recognize and express existing relationships. This article shall not be construed to modify any other provision of the Contract nor shall it create rights or obligations not otherwise provided for in the Contract.

DOE–Sandia Contract at 40–42 (emphasis added).

Although who qualifies as an employee of the federal government is a question of federal law (see Part III below), questions of agency law are determined by state law for FTCA purposes. *See Brandes v. United States,* 783 F.2d 895 (9th Cir.1986); *see also McCall v. United States,* 338 F.2d 589, 592 (9th Cir.) *cert. denied* 380 U.S. 974, 85 S.Ct. 1334, 14 L.Ed.2d 269 (1965) (questions of respondeat superior are also questions of state law in FTCA cases).

Further, Article V of the contract states:

> The parties recognize that the work under this Contract involves unusual, unpredictable and abnormal risks. In view of these circumstances and the no-profit feature of this Contract, *neither* West-

ern [AT & T], [nor] *Sandia Corporation ... shall be held liable for, and the Government shall indemnify and hold them harmless against, any* delay, failure, loss, *expense* (including expense of litigation) or damage (*including personal injuries* and deaths of persons and damage to property) of any kind and *for any cause whatsoever, arising out of or connected with the work,* and whether or not any employee or employees of any such company is or are responsible therefor.

DOE–Sandia Contract, at 7–8 (emphasis added).

Under California law, whether the relationship between parties to a written agreement should be considered to be that of principal and agent hinges upon the intention of the parties as determined from the writing and the accompanying circumstances. *Nichols v. Arthur Murray, Inc.,* 248 Cal.App.2d 610, 612, 56 Cal.Rptr. 728 (1967). The authority of the principal to control the agent is fundamental to the existence of a principal-agent relationship. *Wickham v. Southland Corp.,* 168 Cal. App.3d 49, 59, 213 Cal.Rptr. 825 (1985). The principal need not *exercise* the right of control or actually supervise the work of the agent, since it is the *right* to control that establishes the principal-agent relationship. *Tieberg v. Unemployment Ins. App. Bd.,* 2 Cal.3d 943, 950, 88 Cal.Rptr. 175, 471 P.2d 975 (1970) ("[t]he right to control the means by which the work is accomplished is clearly the most significant test of the employment relationship"); *Housewright v. Pacific Far East Line, Inc.,* 229 Cal.App.2d 259, 267, 40 Cal.Rptr. 208 (1964); Restatement (Second) of Agency § 2 (1958)[4].

The authority of the United States to "control" the actions of Sandia is also set forth in Article II of the contract which provides:

[Sandia's research and development] activities are and shall be carried on for and on behalf of the Government *under the direct control of the DOE* in accordance with the Atomic Energy Acts of 1946 and 1954.

DOE–Sandia Contract at 4 (emphasis added). Given the sensitive nature of atomic research and development, Sandia's responsibility for the maintenance and security of the facilities at Sandia National Laboratories is clearly essential to the successful operation of the Livermore facility.

Moreover, the United States exercised supervisory control over Sandia in a manner consistent with that of a principal-agent relationship. The DOE performed proficiency tests at Sandia which included mock attacks against the facility (Pound Dep. at 37–38); the DOE required classroom and range training for new security force employees and refresher training for veteran employees (Pound Dep. at 36); and DOE inspectors inspected the Livermore premises, including fences, at their discretion, for compliance with DOE orders (Sullivan Dep. at 19, 75–76).

For the coordination and implementation of many activities at the Livermore facility, Sandia functions as an independent contractor of the government. As such, under general principles of agency law, its negligent acts are not imputed to the United States. However, an independent contractor may at the same time serve as an agent for specified purposes designated by the principal. The question of the nature of the authority may be determined by the actual agreement or the conduct of the parties. In this case the contract makes clear distinctions as to the circumstances under which Sandia operates as an independent contractor and those under which it

---

**4.** Section 2 of the Restatement (Second) of Agency (1958) provides: (1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service. (2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master. (3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

operates as an agent. Article XX of the contract provides for specific agency authority. By its terms, a principal-agent relationship exists as to the "management, maintenance, and protection [and] safeguarding" of property at the Livermore facility.[5] The United States, as the principal, must assume liability for the negligence of Sandia, its agent. *See Alvarez v. Felker Mfg. Co.*, 230 Cal.App.2d 987, 997, 41 Cal.Rptr. 514 (1964) (principal is liable for the negligent acts of agent performed within the scope of agent's authority).

Therefore, the court holds that by designating Sandia as its agent for specified purposes, and by holding Sandia harmless for any "failure, loss, expense . . . (including personal injuries and deaths of persons and damage to property) of any kind and for any cause whatsoever" (DOE–Sandia Contract at 7–8), the DOE, acting pursuant to authority given to it by Congress, waived the sovereign immunity of the United States for the limited purposes set forth in the contract.

B. *Sandia as a "Government Employee" Under the Federal Tort Claims Act*

■ Government liability for Sandia's negligence depends on whether Sandia is an "employee of the Government . . . acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The court must apply federal law in determining whether Sandia is a federal employee. *Slagle v. United States*, 612 F.2d 1157, 1160 (9th Cir.1980).

1. *Definition of "Government Employee"*

Under 28 U.S.C. § 2671, an "employee of the government" is defined as

officers or employees of any federal agency, members of the military or naval forces of the United States, . . . *and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.*

(emphasis added). This definition was intended to be applied broadly. *See Witt v. United States*, 462 F.2d 1261, 1263 (2nd Cir.1972); *Dumansky v. United States*, 486 F.Supp. 1078, 1090 (D.N.J.1980).

Independent contractors are specifically exempted from the definition of a "federal agency" under 28 U.S.C. § 2671, which follows the "common-law distinction between the liability of an employer for the negligent acts of his own employees and his liability for the employees of a party with whom he contracts for a specified performance." *Logue v. United States*, 412 U.S. 521, 526–27, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973); *Brucker v. United States*, 338 F.2d 427, 428 n. 2 (9th Cir.1964), *cert. denied*, 381 U.S. 937, 85 S.Ct. 1769, 14 L.Ed. 2d 701 (1965) ("[t]he word 'employee' [under the FTCA] is to be read as having the same general meaning in the Act as the term 'servant' has in the body of rules relating to the doctrine of respondeat superior") (citing Restatement (Second) of Agency § 220 (1958)).

Congress' purpose for including the language "acting on behalf of" in 28 U.S.C. § 2671 is less than clear. *See Logue*, 412 U.S. at 530, 93 S.Ct. at 2220–21. Nevertheless, the Supreme Court in *Logue*, after reviewing drafts of section 2671, found that

[the language was designed] to cover special situations such as the 'dollar-a-year' man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency

---

**5.** The contract (without appendices) is forty-three pages long. Sandia is referred to as a "contractor" or "management contractor" three times and as an "agent" five times. *See* DOE– Sandia Contract, at 12, 40–42. The choice of words by the contracting parties demonstrates that the use of the word "agent" was purposeful. *See* discussion *infra* at 782–785.

pursuant to contract or other arrangement.

*Id.* at 531, 93 S.Ct. at 2221.

### 2. *The "Logue" Case*

The Supreme Court considered the meaning of the "acting on behalf of" language in section 2671 in *Logue.* There, claimants brought suit for the wrongful death of their son who had been confined to a county jail pending trial. The jail was operated by state and local government officials under a contract with the federal government to provide for the safekeeping of federal prisoners. Following a suicide attempt, Logue was to be committed to a medical facility, but hanged himself before he could be transferred. The Supreme Court in *Logue* found that since the contract with the county did not give the United States authority to supervise physically the conduct of the jail's employees, the sheriff's employees were employees of a "contractor with the United States" and were not, therefore, employees of a federal agency or persons "acting on behalf of a federal agency in an official capacity." *Id.* at 530–32, 93 S.Ct. at 2220–22.

*Logue* is different from the instant case. The critical element of control necessary to create the principal-agent relationship, missing in *Logue,* is present here.[6] Under the terms of the contract, the government and Sandia agreed that Sandia was to act as the DOE's agent for certain purposes, including the maintenance and security of property at Sandia National Laboratories. *See* DOE–Sandia Contract at 40–42. The

contract further provided that all work performed by Sandia was under the direct control of the DOE, thereby recognizing the government's need to supervise and control its atomic energy program. *See* DOE–Sandia Contract at 7–8.

Considering the contract language[7] and the fact that Sandia's activities are performed exclusively on a not-for-profit basis for the benefit of the United States, the court finds that Sandia acts "on behalf of" the DOE for the specific activities delineated by the contract, and is therefore a government employee under 28 U.S.C. § 2671. *See State of Maryland v. Manor Real Estate & Trust Co.,* 176 F.2d 414 (4th Cir.1949) (government liable for the torts of a corporation acting on its behalf as a managing agent in the operation of a public housing project); *United States v. N.A. Degerstrom, Inc.,* 408 F.2d 1130 (9th Cir. 1969) (government liable for negligence of heavy equipment operator acting on behalf of the government).

### 3. *Ninth Circuit Authority*

In addition to *Logue,* the Ninth Circuit case law supports the proposition that the United States can be held liable under the FTCA for the negligence of its agent. In *United States v. Dooley,* 231 F.2d 423 (9th Cir.1955), a tenant fell upon a walk at a housing project because a wire which had been erected to protect newly seeded grounds had been allowed to fall down and was lying across the sidewalk. The housing project was owned by the United States

---

6. The government's authority to control Sandia also distinguishes this case from other cases relied on by the government. *See United States v. Orleans,* 425 U.S. 807, 816, 96 S.Ct. 1971, 1976–77, 48 L.Ed.2d 390 (1976) (agents and employees of local community action agency were not federal employees for FTCA purposes because the government "in no sense control[led] 'the detailed physical performance' of [the group's] programs."); *Dumansky v. United States,* 486 F.Supp. 1078 (D.N.J.1980) (government not liable under the FTCA for personal injuries sustained on its property unless it has authority to exercise day to day control over the operations of the managers of its property); *Wright v. United States,* 428 F.Supp. 782 (D.Mont.1977) *aff'd,* 599 F.2d 304 (9th Cir.1979) (government exercised insufficient control over

local, nonprofit corporation to be liable under the FTCA even though the government financed the recreational complex and had retained a reversionary interest in land deeded to the corporation); *Hopson v. United States,* 136 F.Supp. 804 (W.D.Ark.1956) (government not liable under the FTCA when it merely reserved the right to inspect facilities of private corporation operating ammunition depot).

7. Under the contract, Sandia receives no fee or profit from the government. The Supreme Court determined in *Logue* that the "acting on behalf of" language of 28 U.S.C. § 2671 was to cover persons in the service of the government "without pay." 412 U.S. at 531, 93 S.Ct. at 2221.

and was managed by its "agent," [8] Carroll, Hedlund & Associates, Inc., a Washington corporation. Employees of both the housing project and Carroll, Hedlund & Associates were responsible for inspecting and maintaining the fences. The Ninth Circuit ruled that employees of the housing project and those of its "agent" Carroll, Hedlund & Associates were "employees" under 28 U.S.C. § 2671. The court found the government solely liable for the negligence of its employees. The Ninth Circuit stated

> [h]ere the alleged negligence of the caretakers consisted in the building and failure to maintain the fences which were in such position that a wire which fell or broke got on the walk.... The duty of these agents was to prevent these wires from becoming a hazard.

*Id.* at 425.

#### 4. *The Government's Authorities Distinguished*

In support of its contention that Sandia is not a government employee within the meaning of 28 U.S.C. § 2671, the government argues that other courts have found Sandia to be an independent contractor. *See United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982); *Baca v. United States*, 467 F.2d 1061 (10th Cir.1972). Neither case applies in the context of this action.

In *New Mexico*, three private entities, including Sandia Corporation, contracted with the Federal government to manage government-owned atomic laboratories in New Mexico.[9] The United States sought a declaratory judgment that the contractors were constitutionally immune from New Mexico's state gross receipts and compensating use taxes. The Supreme Court in *New Mexico* established the rule that tax immunity was only appropriate when the government itself was to be taxed or when "an agency or instrumentality is so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *Id.* at 735, 102 S.Ct. at 1383. In applying this rule to Sandia, the Supreme Court held that Sandia and the other contractors could not be considered "constituent parts" of the federal government and therefore could not be given tax immunity. 455 U.S. at 738–40, 102 S.Ct. at 1384–85.[10]

*New Mexico* does not control in the instant case. Although the Supreme Court closely examined the relationship between the government and Sandia, the Court in *New Mexico* was concerned with the question of tax immunity.[11] Tax immunity is simply not analogous to immunity from liability for torts.

In deciding whether to grant tax immunity to Sandia, the Court focused on the effect of granting tax immunity for certain procurement practices. The Supreme Court necessarily considered the overall relationship between the government and Sandia. As the Court reasoned, "a finding of constitutional tax immunity requires

---

**8.** Unfortunately, the Ninth Circuit's decision does not specify whether the corporation was the agent of the government by an agreement of the parties or whether the court merely concluded that a principal-agent relationship existed.

**9.** Both Sandia National Laboratories in Livermore, California, and Sandia National Laboratories in Albuquerque, New Mexico, are government-owned, contractor-operated research facilities managed by Sandia Corporation pursuant to 42 U.S.C. § 2051.

**10.** The Supreme Court's decision in *New Mexico* is one in a series of Supreme Court decisions addressing the tax immunity of Atomic Energy Commission contractors. *See United States v. Boyd*, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964); *Livingston v. United States*, 364 U.S. 281,

80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960) (per curiam), *aff'g*, 179 F.Supp. 9 (E.D.S.C.1959); *Kern–Limerick, Inc. v. Schurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954); *Carson v. Roane–Anderson Co.*, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952).

**11.** The Tenth Circuit, after reviewing the Supreme Court's decisions dealing with the state tax immunity of government contractors, acknowledged that, "[a]lthough there is language in these Supreme Court opinions suggesting that the results turn on traditional agency principles ... it seems evident that the Court is more concerned with preserving the delicate financial balance between our co-existing sovereignties than with rigid adherence to agency law terminology." *United States v. State of New Mexico*, 624 F.2d 111, 116 (10th Cir.1980).

something more than the invocation of traditional agency notions: to resist the state's taxing power, a private taxpayer must actually 'stand in the Government's shoes.'" 455 U.S. at 736, 102 S.Ct. at 1383–84 (citation omitted). The issue of government liability for an action in tort is more narrowly focused. To determine tort liability in this case, the court need only look to the relationship between the parties with respect to the maintenance and security of the facilities at Sandia National Laboratories.

Although the decision in *New Mexico* is not dispositive of the issue of tort liability, the arguments raised by the government in that action are enlightening considering its contentions in the present case. In *New Mexico*, the government took the position that Sandia should be immune from state taxes because Sandia was its agent authorized to act on its behalf.[12] Like the contract in this case, the contract in *New Mexico* not only authorized Sandia to act as its agent for the disbursement of funds and the "purchase, lease or other acquisition" of property, it also included the identical provision authorizing Sandia to "act ... as the agent of the ERDA [Energy Research and Development Administration] in the ... management, maintenance, protection, safeguarding ..." of all property used in the performance of the contract." DOE–Sandia Contract at 41, Brief for Petitioner at ——, *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982) (No. 80–702) (available on LEXIS, Genfed Library, Briefs File at 21).

It is ironic that the government in *New Mexico* urged the Supreme Court to find dispositive the words creating an agent-principal relationship but now urges this court to overlook the significance of those words. In *New Mexico*, the government acknowledged the significance ascribed to words depicting legal relationships. For example, the government admitted that Sandia and the other contractors

> may be ... 'independent contractor[s],' rather than ... 'servant[s]' for ... given 'function[s] under' the contract[s] (e.g., directing the details of day-to-day ... operations and the hiring and direct supervision of employees).

455 U.S. at 725, 102 S.Ct. at 1378 (ellipsis in original). Further, in its brief before the Supreme Court, the government argued that Sandia and the other contractors should be treated as agents of the government because the contracts explicitly designated them as procurement agents of the United States. *See* Brief for Petitioner at ——, *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982) (No. 80–702) (available on LEXIS, Genfed Library, Briefs File at 13–17).

Although the Supreme Court in *New Mexico* found, for tax immunity purposes, that the choice of words in the contract was not binding, given the actual relationship between the parties, the government, having acknowledged the legal significance attached to the word "agent," cannot ignore its application in this case.[13] The fact that the government has retained the identical provision in its contract for more than twelve years indicates that it views Sandia

---

**12.** The Supreme Court noted,
> "[p]rior to July 1, 1977, the Government's [contract with Sandia and the others] did not refer to the contractors as federal 'agents.' On that date—some two years *after* the commencement of this litigation—the agreements were modified to state that each contractor 'acts as an agent [of the government] ... for certain purposes,' including the disbursement of Government funds and the 'purchase, lease, or other acquisition' of property."
455 U.S. at 726, 102 S.Ct. at 1378.
The Tenth Circuit found that the word "agent" was added by the contracting parties in *New Mexico* in an apparent effort to identify the contractors as closely as possible with the

government, so as to immunize the contractors as federal entities from state taxation. *United States v. State of New Mexico*, 624 F.2d 111, 120–121 (10th Cir.1980).

**13.** The government represented to the Supreme Court that the contract modifications—inserting the word "agent" in the contract—(*see* n. 12 *supra*), "were not designed to alter the substantive relationships provided by the contracts ... [but to confirm] the long-standing relationship and practice of the parties." Brief for Petitioner at ——, *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982) (No. 80–702) (available on LEXIS, Genfed Library, Briefs File pp. 20–21).

as its agent for purposes of security and maintenance at Sandia National Laboratories.

*Baca v. United States*, 467 F.2d 1061 (10th Cir.1972), cited by the government, is inapposite to the court's analysis in this case. In *Baca*, the Tenth Circuit stated that it could take judicial notice of the common knowledge that Sandia is a "contractor" with the Atomic Energy Commission, but declined to do so. *Id.* at 1063 n. 2. In its decision, the Tenth Circuit neither analyzed the relationship between Sandia and the United States nor eliminated the possibility that Sandia, in its overall capacity as a contractor, could also perform as an agent for specific purposes on behalf of the government. The court in *Baca* did not refer to the contract and it is impossible to determine from a reading of the case whether any contract language created a relationship other than that of an independent contractor.

Lastly, the government argues that whether an entity is a government employee or an independent contractor is not dictated by the specific language used in the agreement, but by the actual relationship between the parties. *See Norton v. Murphy*, 661 F.2d 882 (10th Cir.1981); *Costlow v. United States*, 552 F.2d 560 (3rd Cir. 1977). Both cases involved FTCA suits filed against the postal service for the negligence of contract mail carriers.

Both cases are distinguishable. In *Norton* and *Costlow*, the contract between the government and the postal carrier designated the carrier as an independent contractor of the government. In both cases, the government asserted the contract provision to avoid liability. The court today declines to permit the government to escape liability under a contract in which it deliberately designated the contractor as its "agent." In so doing, this court gives great weight to the contractual provisions showing that the parties contemplated a principal-agent relationship. In addition, the court has also considered the actual relationship of the parties and finds that

Sandia acts as the agent of the United States in the maintenance and security of the Livermore facility.

### III. *Government's Duty to Build Secure Fences*

As a third basis for summary judgment, the government contends that it had no duty to ensure that fences at Sandia National Laboratories would be safe to climb. Based on the evidence, the court finds that this remains a triable issue of material fact.

Under California law, a landowner in the management of his or her property has the duty to act reasonably in view of the probability of injury to others. *Rowland v. Christian*, 69 Cal.2d 108, 119, 70 Cal.Rptr. 97, 443 P.2d 561 (1968); *see also Henderson v. United States*, 827 F.2d 1233 (9th Cir.1987), *withdrawn and new opinion issued*, 846 F.2d 1233 (9th Cir.1988) (lack of foreseeability that vandals would climb power poles to cut and steal copper wires supported a finding of no negligence in failing to restrict access to power poles).

Under the FTCA, the government is subject to liability for physical harm caused by dangerous conditions on its property as any private person would be under California law.[14]

The government contends that it had no duty to build or maintain secure fences at Sandia National Laboratories because it was not foreseeable that security inspectors would climb them. This contention is placed in doubt by several facts in the record.

In the course of his DOE-required training at Sandia, Ferguson and the other security inspectors received hands-on instruction on how to climb over walls and other obstacles. Ferguson Aff. para. 8. As part of his classroom training, Ferguson watched training films which demonstrated "climbing" and "dropping" techniques, including one video which showed security personnel at Sandia National Laboratories

---

**14.** The FTCA imposes liability, if otherwise proper, "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

in Albuquerque climbing fences in pursuit of intruders. *Id.*

During a briefing session conducted by training instructors on the morning of the accident, Ferguson and other security inspectors were taught how to respond to armed intrusions, how to use evasive actions on vehicles, and how to "cover" a building so that armed intruders would not escape. Ferguson Dep. at 35. Ferguson watched training films in which security personnel were shown going over walls, climbing up ladders and buildings, and repelling on a rope down the side of a building. *Id.*

After the classroom instruction, Ferguson and the other security inspectors participated in exercises that taught them how to apprehend unauthorized intruders. During the course of the exercises, the training instructor performed a "spider drop," whereby a person hangs by one foot and one hand from the roof of a building before dropping to the ground. Ferguson Dep. at 36–37. All of these training exercises show that the government believed that security guards at Sandia might be called upon to climb fences in the course of their employment.

Plaintiff established that security inspectors at Sandia National Laboratories are trained to contain, and, if necessary, pursue unauthorized personnel on the premises. Security inspectors presumably are expected to use the techniques they have been taught, when necessary. Indeed, DOE testimony shows that at least one training scenario involved a mock terrorist escaping the facility over a perimeter fence. Sullivan Dep. at 62.

Moreover, the parties dispute whether, on the morning of the accident, Ferguson was warned not to "climb fences or trees." The government insists he was. Gross Aff. para. 12. Ferguson insists he was only told not to do anything he was not physically capable of. Ferguson Aff. para. 5.

Because plaintiff has presented evidence which shows that he was exposed to numerous government sponsored training exercises involving climbing, the court finds that a genuine issue of material fact remains whether it was foreseeable that Ferguson would attempt to climb the fence and, whether the government therefore had a duty to build fences capable of withstanding such climbing. Therefore, the government's motion is denied.

CONCLUSION

For the reasons set forth herein the government's motion for summary judgment is denied on all grounds. In light of the unique questions raised by this action, the court certifies this matter for appeal pursuant to 28 U.S.C. § 1292(b). There is no existing law dealing with the agency relationship and government liability under the FTCA. Under the current posture of this case, the court would proceed to trial on the plaintiff's negligence claim.

The need for trial may be obviated, however, if the appellate court disagrees with this court's reasoning. A determination on this critical, novel issue would aid the parties and the court and be more economical for all, particularly since the government has indicated that after trial it would seek review in any event.

IT IS SO ORDERED.