Evelyn **HEINRICH** on Behalf of her husband George **HEINRICH,** Henry M. Sienkewicz, Jr., on behalf of his mother Eileen Rose Sienkewicz, Rosemary Gualtieri on behalf of her father Joseph Mayne, Walter Carl Van Dyke on behalf of his father Walter Carmen Van Dyke, and all others similarly situated, Plaintiffs,

v.

William H. **SWEET,** M.D., Trustee of the Lee Edward Farr Trust dated 1/11/71, as amended, The Estate of Lee Edward Farr, M.D., Associated Universities, Inc., Massachusetts General Hospital, Massachusetts Institute of Technology, and the United States of America, Defendants.

No. CIV. A. 97–12134–WGY.

United States District Court, D. Massachusetts.

Feb. 9, 2000.

Anthony Z. Roisman, Cohen, Milstein, Hausfeld & Toll, Washington, DC, John K. McGuire, Jr., McGuire & McGuire, Worcester, MA, Anthony Z. Roisman, Lyme, NH, Martin H. Freeman, Mark A. Freeman, Freeman & Freeman, P.C., Rockville, MD, John M. Clifford, Billie P. Garde, Clifford, Lyons, & Garde, Washington, DC, Raymond J. Heslin, Rubin, Baum, Levin, Constant & Frienman, New York City, Herbert E. Milstein, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Plaintiffs.

Thomas P. Billings, Karen White Salon, Sally & Fitch, Boston, MA, Joseph L. Doherty, Jr., Raymond J. Kenney, Christopher J. Maley, Katharine S. Perry, Martin, Magnuson, McCarthy & Kenney, Gail A. Anderson, Martin, Magnuson, McCarthy & Kenney, William Shields, Sarah G. Hunt, Day, Berry & Howard, Boston, MA, Kevin T. VanWart, Jerome A. Karnick, Marc J. Zwillinger, Kirkland & Ellis, Kevin T. Van Wart, Jonathan Silverman, Kirkland & Ellis, Chicago, IL, Francis C. Lynch, Lori B. Silver, Constantine Athanas, Palmer & Dodge, Boston, MA, Owen Gallagher, Garrett Harris, Sally A. VanderWeele, Gallagher & Gallagher, P.C., Charlestown, MA, Burke M. Wong, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM

YOUNG, Chief Judge.

### I. *Introduction*

Traditionally, the sovereign is immune from claims and suits by its subjects. The United States government is willing to come into its courts and defend against such claims but is unwilling to subject itself to trial by jury. *See* 28 U.S.C. § 2402. Therefore, so much of this case, as makes a claim against the United States under the Federal Tort Claims Act, has been tried to the Court concomitant with the trial by jury of the other defendants. Upon the conclusion of the jury trial,[1] the parties supplemented the record with additional documents pertinent to the involvement of the Atomic Energy Commission ("Commission") as well as certain deposition testimony. The United States now moves for judgment pursuant to Federal Rule of Civil Procedure 52(c), contending that the statute of limitations, 28 U.S.C. § 2401(b), the discretionary function exception, 28 U.S.C. § 2680(a), and the government contractor exception, 28 U.S.C. § 2671, bar the plaintiffs' claims. This

---

[1]. After a 20–day jury trial of the claims of Evelyn Heinrich and Henry Seinkewicz, the jury awarded Heinrich $500,000 compensatory damages and $2,000,000 punitive damages, and Sienkewicz $2,500,000 compensatory damages and $3,000,000 punitive damages against Dr. Sweet and Massachusetts General Hospital ("Mass General") for negligence and wrongful death. The jury rejected a claim for lack of informed consent and found the Massachusetts Institute of Technology not liable. The Court had earlier directed a verdict against Rosemary Gualtieri and Walter Van Dyke and for the Farr Trust and Associated Universities, Inc. ("Associated Universities" or "AUI") on all claims.

Memorandum addresses only the third of these arguments.

## II. *Discussion*

### A. *Heinrich III*

In denying the United States' motion to dismiss based upon the government contractor exception, *see Heinrich v. Sweet*, 62 F.Supp.2d 282, 321–23 (D.Mass.1999) ("Heinrich III"), the Court offered the following discussion:

> The [Federal Tort] Claims Act provides a cause of action against the United States for injury "caused by the negligent or wrongful act or omission of any employee of the Government . . . ." 28 U.S.C. § 1346(b)(1). The term "employee of the government" includes "persons acting on behalf of a federal agency . . .," but specifically excludes "any contractor with the United States." 28 U.S.C. § 2671. Therefore, the United States is not liable for the negligence of an independent contractor's employee. *See Brooks v. A.R. & S. Enters., Inc.*, 622 F.2d 8, 10 (1st Cir.1980). The United States asks this Court to dismiss the Plaintiffs' claims insofar as they relate to the alleged negligence of Associated Universities employees because Associated Universities was an independent contractor.
>
> In determining whether a contractor acts on behalf of a federal agency, a court must examine "whether its day-to-day operations are supervised by the Federal Government." *United States v. Joseph*, 425 U.S. 807, 815, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *accord Brooks*, 622 F.2d at 11 ("[T]he critical question is . . . whether the United States directs the manner in which the contractor carries out its obligations under the contract."). The focus of this inquiry is "the authority of the principal to control the detailed physical performance of the contractor." *Logue v. United States*, 412 U.S. 521, 527–28, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). For instance, a contractor's use of government-owned property does not, by itself, transform that contractor into an agent of the government. *See Brooks*, 622 F.2d at 11. If, however, the government supervises or controls the manner in which the contractor uses government property, the contractor may in fact be acting on behalf of the government. *See id.* Likewise, while the United States' general right to inspect does not subject the government to liability for its contractors' torts, *see id.* at 12, evidence of the United States' "daily supervision and inspection of the activities of the [contractor may] satisfy the test of liability under *Orleans*," *id.* at 11.

Under the contract between Associated Universities and the government for the operation of Brookhaven National Laboratory, Associated Universities had the following duties: (1) making all necessary provisions (including the hiring of personnel) for the establishment, operation, and maintenance of Brookhaven National Laboratory; (2) the design, engineering, construction, and alteration of the buildings, facilities, and utilities; (3) the operation, management, and maintenance of the laboratory; (4) the conduct of research and development in the atomic and related fields described in Section 3 of the Atomic Energy Act of 1946; (5) providing the facilities to the personnel of public and private scientific institutions for the conduct of research and development; (6) maintenance of the necessary guard and fire-fighting forces for the laboratory; (7) training of scientific and technical personnel; and (8) dissemination and publication of unclassified scientific and technical data developed in the course of work. *See* Dkt. # 81, Ex. 3 at 3–4.

As already extensively described throughout this opinion, the record reveals that the Commission was intertwined with the execution of most of these duties. Moreover, the Task Force Report makes clear the hands-on relationship between the Commission and

Associated Universities. According to the report, the Commission exercised its control in the following manner:

> The primary instruments for determining and controlling the contractor's work are the program assumptions which are the basis for planning, the budget submissions, the approved financial plans, and directives authorizing specific projects. Continuing control to assure that the contractor adheres to established programs is exercised through such devices as monthly cost reports, regular progress reports, conferences with the contractor, review and observation of the work by [Commission] engineers and other specialists, inspection of finished products, and audits.

> .    .    .    .    .

> Inspection involves an overall and up-to-date familiarity with the nature and progress of the work which is *gained by daily observation,* close contact with contractor personnel, examination of the reports and cost statements, review of proposed procurement and sub-contract actions, and regular conferences with contractor top management regarding progress and difficulties .... Such inspection appears to us necessary for the discharge of inherent AEC responsibility ....

Dkt. # 85, Ex. 7 at 10, 17 (emphasis added). A Commission officer also explained at a symposium that the Commission and its contractors are "partners in the general sense of the word." *Id.* at Ex. 8 at 19. Indeed, the Commission even agreed to indemnify Associated Universities for all liability awards issued against it, including personal injury awards, barring bad faith or willful misconduct on the part of Associated Universities. *See* Dkt. # 81, Ex. 3 at 15.

The relationship between the Commission and Associated Universities went beyond the general supervisory relationship between a principle and an independent contractor. The Commission controlled almost every aspect of Brookhaven National Laboratory, from its expenses to its research goals to its output. The regular supervision and inspection involved the substance of Associated Universities' work, not just its compliance with the terms of the contract. For these reasons, this Court holds that Associated Universities was not an independent contractor but an entity acting on behalf of a government agency. *See Costa v. United States,* 845 F.Supp. 64, 68 (D.R.I.1994) (concluding that a clinic doctor who used a veteran hospital's equipment and was bound by its bylaws, policies, and procedures was an employee rather than an independent contractor for purposes of the Claims Act).

*Heinrich III,* 62 F.Supp.2d at 321–23.

### B. The Present Factual Record

The United States now argues that the evidence in the record does not support the interpretation of the Commission's role that the Court accepted for purposes of the dismissal motion:

### 1. Statutory and Regulatory Role of the Commission

Congress established the Commission in April 1946 with an eye toward "improving the public welfare, increasing the standard of living, strengthening free competition in private enterprise, and promoting world peace." Atomic Energy Act of 1946 (the "Act"), Pub.L. No. 585, 60 Stat. 755. The Act provided that the Commission could interact with "private or public institutions" through contracts, agreements, and loans for the conduct of research relating to radioactive materials for medical, biological, and health purposes. *See* 1946 U.S.C.C.S. 725 (1946); 42 U.S.C. § 2051.

Legislative history reveals that Congress did not want the Commission's oversight to be too broad:

[We are] particularly careful to refrain from inserting prohibitions or restrictions of any nature on scientific research ... [and sought to] ... confine[ ] the powers of the Commission over independent research to the minimum necessary to protect national security and to prevent hazards to the public safety and health.

Special Senate Committee on Atomic Energy, S.Rep. No. 1211, 79th Cong., 2d Sess. (April 19, 1946), *reprinted in* 1946 U.S.C.C.S. 1327, 1329. In 1954, Congress amended the Act, directing that the Commission "permit the widest amount of effective medical therapy possible ... and to impose the minimum amount of regulation consistent with ... [the] promot[ion][of] the common defense and security and ... the health and safety of the public." 42 U.S.C. § 2134.

The Commission established the Division of Biology and Medicine (the "Division") to oversee "research relating to atomic energy in the fields of biology and medicine." AEC Bulletin GM–32, Organization and Management Functions and Delegations by Carroll Wilson, AEC General Manager, United States PEX JJ at 1. The Director of the Division was "responsible for the coordination and review of budgets, the defense of such budgets, and the general supervision of expenditures made under the approved budgets and programs." *Id.* at 2. Later, the Division's primary functions were defined to include the promotion of the national welfare through the development of atomic energy in biology and medicine, the study and treatment of diseases, including cancer, and the strengthening of the nation's resources through biomedical research by the use of radioactive materials. *See* U.S. Atomic Energy Commission Transmittal Notice—revision of Bulletin GM–O & M–13, United States PEX ABR at 1–2. The Director was granted broad authority to "enter into, extend and modify contracts ... and act as the representative of the AEC for the administration of contracts

executed under his authority or assigned to him for administration." *Id.* at 4.

Under that authority, the Division issued guidance for researchers seeking funding which emphasized that "the Atomic Energy Commission recognizes the importance of independent research, and its policy is to assist competent investigators working in an environment favorable to productive research along lines which the scientist himself considers promising and consistent with the interest of his institution." Atomic Energy Commission Division and Research, Division of Biology of Medicine, Division of Reactor Development Revised Guide for the Submission of Research Proposals, United States PEX JL at 1.

### 2. *The Commission's Contracting Policies*

Section 4 of the Act authorized the Commission to enter into contracts with industry, universities, and research institutions to operate production plants and laboratories, and to conduct research. *See* § 4, 60 Stat. at 755. The Commission used "cost" contracts for the management and operation of government-owned facilities, such as Brookhaven National Laboratory. *See* Ninth Semiannual Report of the Atomic Energy Commission, United States PEX ACF at 49–53. This type of contract "describes in broad terms the scope of the work to be done, and places considerable emphasis upon the development of long-term and annual work programs, and upon provision for reports and information on results and accomplishments." *Id.* at 52. Furthermore, "authority and responsibility are placed on the contractor to carry out the program in accordance with the broad provisions of a negotiated contract." *Id.*

Contract No.AT–30–2–GEN–16 governed the relationship between the Commission and Associated Universities. United States PEX ACG at 2. Associated Universities was "to equip, staff, manage, operate and maintain [Brookhaven]," and "it [wa]s the desire of the [Commission] to

procure for the Government managerial skill and responsibility which will permit flexibility in administrative controls and freedom from detailed supervision ..." Contract No.AT–30–2–GEN–16, United States PEX ACG at 3. With respect to boron neutron capture therapy ("BNCT"), officials from the Division discussed the initial clinical trials with Associated Universities, and authorized a continued supply of boron. *See* Proposal and Authorization for Research or Development–Medical Research (Cancer), United States PEX ACI. The Commission had a similar relationship with Dr. Sweet at Mass General, administering his contract research through reports and periodic field visits. *See* Memorandum for File: Visit with Dr. William Sweet at Massachusetts General Hospital, March 30, 1959, United States PEX ACJ.

In 1951, the Commission employed approximately 5000 employees to manage and oversee 55,000 contractor employees. *See* Trial Ex. 67 at 32. By 1953, the program for off-site research programs for the Division numbered 370 contracts in over 150 institutions. *See* Minutes Advisory Committee for Biology and Medicine Thirty–Eighth Meeting held at Cancer Research Committee, United States PEX ADC at 7. In June of 1953, at the request of the Commission, a task force was established to review the programs and policies of the Commission with respect to its contractors. The Task Force Report on the Basic AEC–Contractor Relationship stated:

> In speaking of AEC "control and supervision" of contractors, there is intended no implication that the role of AEC's contractors is that of an agent carrying out the Commission's directions and plans. Operating, research, and engineering contractors have a principal share not only in execution but in conception and shaping of programs.

United States Atomic Energy Commission, Washington D.C.—AEC Contract Administration, Management, and Organization report by The Task Force on Basic AEC Contractor Relationships, United States PEX GO at 6. The Task Force Report went on to note that "supervision and control of research and development vary with the size and nature of the project, but conform generally to the pattern of budget control, inspection visits, and review of reports and records." *Id.* at 11. The Report also stated:

> We would like to emphasize again that our conception of the positive responsibility of the AEC field managers does not reduce the responsibility of contractors, but rather complements it. The essence of the manager's job is to see that the contractor understands his responsibility, has planned and is taking adequate action to meet it, and has all help AEC can give him in doing his work. We do not ask that the manager do the work; we do ask that he know currently, before completion, whether it can be expected to be done well and economically.

*Id.* at 16.

While this Court did note in *Heinrich III* that the Task Force Report emphasized "daily observation" as a key method for Commission supervision of contractors, *Heinrich III*, 62 F.Supp.2d at 323, the Report is also careful to note that "[s]upervision and control of research and development vary with the size and nature of the project ...." United States PEX GO at 11.

### 3. The Relationship Between the Commission and Associated Universities

While the United States owned the land, fixtures, equipment, and other property constituting the physical plant of Brookhaven, "the operation and management of Brookhaven, as well as all of the research and experimentation performed there, was provided by Associated Universities on an independent contractor basis." *Heinrich III*, 62 F.Supp.2d at 292.

Dr. James Robertson was a researcher employed by Associated Universities. He assisted in the BNCT clinical trials conducted at Brookhaven in 1951. Dr. Robertson testified that Dr. Sweet and Dr. Farr prepared the proposal and made the determination that the research was a worthwhile project. *See* Robertson Dep. at 27:9–22. He further testified that Dr. Dunham, Dr. Warren, or other Commission officials "[had no] appreciable input into the details of how the [BNCT] procedures were done." *Id.* at 140:21–141:17. Dr. Robertson concluded that the Commission officials had to know the researchers' proposals in a conceptual, rather than a detailed, manner. *See id.* at 141:19–143:5. He also did not recall any Commission personnel being present at Brookhaven during any of the BNCT procedures or directing how the BNCT procedure was to be performed. *See id.* at 293:16–294:17.

Dr. Victor Bond began work at Brookhaven in 1955, became head of the division of microbiology in 1957 and served in that capacity until 1962. *See* Bond Dep. at 8:14–21. Dr. Bond assisted Dr. Farr in the BNCT clinical research conducted at Brookhaven. *See id.* at 8:22–23. He testified that "there would be no reason for an AEC person to be present [at the time of the administration of BNCT] or any other place in the procedure." *Id.* at 68:19–24. To the best of his recollection no Commission official ever told the Brookhaven team how to conduct the clinical investigations. *See id.* at 69:5–9. Dr. Bond testified that Brookhaven submitted reports to the Commission, but "the setup was that ... the AUI contracted with AEC to run the laboratory." *Id.* at 69:20–70:7. Then the AUI was left to Brookhaven to run the laboratory. *See id.* at 70:7–8. And the AEC "was in it, but pretty far removed ... from the actual work." *Id.* at 70:8–11. Similarly, Dr. Mortimer Mendelsohn, who assisted in the early BNCT trials in 1951, testified that while he "took for granted" that the Commission had to approve of the trials, he does not recall any Commission employees being actually involved in the

treatment of any patients. *See* Mendelsohn Dep. at 68:12–70:10. Dr. Howard Bagnall, who assisted in the treatment of Mr. Van Dyke, testified that he does not recall any Commission official being involved in any of the BNCT treatments, and that he took his orders from Dr. Farr. *See* Bagnall Dep. at 59:23–62:16.

Veronica Brooks, who worked as a nurse at Brookhaven in the mid–1950s, recalled that the Commission had a presence at Brookhaven, but she has no recollection of dealing with the Commission directly. *See* Brooks Dep. at 56:24–57:14. She further testified that she was unaware of any employees of the federal government who were actually at Brookhaven supervising or participating in the BNCT studies. *See id.* at 73:20–25.

### 4. *The Relationship Between the Commission and Mass General*

Dr. Sweet was an employee of Mass General. *See* Second Amended Compl. ¶ 22. Dr. Sweet's BNCT research proposal was approved by the Mass General Surgical Executive Committee. *See* Trial Ex. 10. It was also reviewed by the General Executive Committee and the Board of Trustees of Mass General. *See id.*

Janette R. Messer worked for Dr. Sweet at Mass General between 1950 and 1980. She supervised the laboratory for Dr. Sweet and assisted in the preparation of grant applications. *See* Messer Dep. at 28:18–29:10. She testified that, to her knowledge, she never met with any Commission officials during the time she worked at Mass General in the laboratory. *See id.* at 37:17–21.

Dr. Albert Soloway, an employee of Mass General, testified that Commission officials would visit Mass General to review progress and evaluate Dr. Sweet's work. *See* Soloway Dep. at 64:11–21. Dr. Soloway testified that they may have visited once a year. *See id.* at 64:22–65:4. According to Dr. Soloway, all of the people who actually conducted the BNCT re-

search were either employees of Mass General or MIT. *See id.* at 65:9–66:10. The function of the Commission with respect to BNCT experimentation was "administrative," and not "to supervise the day-to-day research." *See id.* at 65:19–66:10.

Dr. Robert J. Ojemann was a surgical resident training under Dr. Sweet at Mass General between 1957 and 1961 and assisted in the BNCT treatments at MIT. *See* Ojemann Dep. at 11:3–13. He testified that he did not recall any Commission physicians present at any time during which either he or Dr. Sweet treated any of the BNCT patients. *See id.* at 66:9–14. Dr. David Lanning was a research associate at MIT and was involved in supervising operations related to the MIT Reactor. *See* Lanning Dep. at 11:4–16. He did not recall any officials from the Commission being present during the BNCT treatments at MIT. *See id.* at 78:22–79:17.

## C. Analysis

■ The federal government may be sued for the actions of a government contractor and its employees only if the government is found to have had the authority "to control the detailed physical performance of the contractor" and to have supervised its "day-to-day operations." *United States v. Orleans,* 425 U.S. 807, 814–15, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). In *Orleans,* a plaintiff brought suit against the United States for injuries allegedly caused by a local community action agency that received all of its operating funds from the Office of Economic Opportunity ("OEO"), a federal agency. The OEO "suppl[ied] ... financial aid, advice, and oversight only to assure that federal funds not be diverted to unauthorized purposes." *Id.* at 818, 96 S.Ct. 1971. The controlling question, according to the Supreme Court, was "not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *Id.* at 815, 96 S.Ct. 1971.

■ In *Heinrich III,* facing a motion to dismiss for lack of subject matter jurisdiction, the Court relied upon the statement in the Task Force Report that "[i]nspection [by the Commission] involves an overall and up-to-date familiarity with the nature and progress of the work which is gained by daily observation ...," *Heinrich III,* 62 F.Supp.2d at 323, to hold that the Commission exercised supervision of the day-to-day operations of Brookhaven. The evidence now in the record, however, demonstrates that, although the Commission may arguably have been empowered to exercise such supervision, it chose not to do so. This factual development is significant, for "[c]ourts applying the FTCA have consistently held that a government's right to inspect the work of a contractor and to stop work that does not conform to the terms of the contract does not constitute control over the contractor's employees." *Brooks v. A.R. & S. Enterprises, Inc.,* 622 F.2d 8, 12 (1st Cir.1980). Review of the entire record reveals that the Commission provided oversight, but not detailed supervision, of research programs funded by federal monies. The whole purpose of the Commission's contracting with private researchers was to take advantage of the expertise offered by independent research. The contract with Associated Universities explicitly stated that Associated Universities was to enjoy "freedom from detailed supervision." Contract NO.AT–30–2–GEN–16, United States PEX ACG at 3. "Nothing could be plainer than the [federal] intent that the local entities here in question have complete control over operations of their own programs with the Federal Government supplying financial aid, advice, and oversight only to assure that federal funds not be diverted to unauthorized purposes." *Orleans,* 425 U.S. at 818, 96 S.Ct. 1971; *see also Reany v. United States,* 738 F.Supp. 680, 682–83 (E.D.N.Y. 1990) ("[t]his Court finds that Associated Universities is an independent contractor,

and therefore an action brought against the United States based upon Associated Universities' negligence is barred by sovereign immunity.").

There is no doubt that the Commission was aware of the nature of the BNCT trials and the dearth of scientific evidence to support Dr. Sweet and Dr. Farr's hopes for therapeutic potential. *See* Heinrich Proposed Findings of Fact ¶¶ 11–14 (gathering documentary evidence regarding knowledge and awareness of Commission *vis a vis* BNCT trials and their shortcomings). Later, in 1968, the Division acknowledged that "[t]he results of the clinical trials were almost uniformly discouraging. In addition to the lack of evidence of significantly increased survival time, there was evidence of undesirable irradiation effects." Letter to Edward J. Bauser, Exec. Director, Joint Committee on Atomic Energy from AEC General Manager w/Comments of the Division of Biology of Medicine dated 11/18/68, Heinrich PEX FQ. Knowledge alone, however, does not make the Commission a supervisor of the private defendants for purposes of the Federal Tort Claims Act. Instead, for the alleged negligence of Associated Universities, Dr. Farr, Mass General, and Dr. Sweet to be imputed to the United States, their "day-to-day operations [must be] supervised by the Federal government." *Orleans*, 425 U.S. at 815, 96 S.Ct. 1971.

The First Circuit's opinion in *Brooks*, 622 F.2d at 8, is instructive. In *Brooks*, plaintiffs sued the United States to recover for injuries negligently caused by a security guard hired to provide guard services at an air force base. *See id.* at 9. The First Circuit rejected the contention that the United States exercised daily supervision over the security company, despite the fact that the contract between the government and the security company "governed in detail the duties of the ... guards at the base" and "specified the training and qualifications of ... guards." *Id.* at 11. The Court ruled that "[t]he Navy had a legiti-

mate interest in assuring the security of the base and the suitability of [security company] personnel for guard duty, but the government's authority under the safety program to screen applicants and to discharge guards who threatened military security did not constitute control within the meaning of the FTCA." *Id.*

The First Circuit also held that the fact that "[t]he United States Navy furnished motor vehicles and virtually all of the equipment used by the guards" was not controlling. *Id.* "The critical question is not whether a government contractor performs its contractual obligations with United States property or in accordance with federal standards and regulations, but whether the United States directs the manner in which the contractor carries out its obligations under the contract." *Id.* Because the United States merely specified general requirements in the contract, the First Circuit ruled that the security company remained an independent contractor. *See id.*

The present facts are analogous to *Brooks*. While the Commission funded the operations of the private defendants, established guidelines for their conduct, and reserved the right to review their operations, the Commission did not exercise the kind of day-to-day control that the Supreme Court required in *Orleans*. Moreover, the First Circuit's ruling in *Brooks* suggests that the outward appearance of government authority to the public is not controlling for purposes of the Federal Tort Claims Act. In other words, just like the public's view of Brookhaven National Laboratory as a government-owned and -operated facility, the plaintiffs in *Brooks* most likely believed that any security guards present on a federal military base were government employees. That perception, however, is irrelevant to the question of whether the government *in fact* controlled the day-to-day operations of its contractor.

Heinrich attempts to counter this line of reasoning by arguing that "[t]his case is

about the failure of the [Commission] to initially implement its policy 1) against funding a medical experiment for which there was no reasonable basis to believe it had therapeutic value which outweighed its risks and 2) against funding any experiment unless the informed consent of the patient was obtained and the fact of that consent was noted in the records of the patient." Heinrich Opp. at 9. In other words, Heinrich seeks to recover based upon the activity (or inactivity) of the Commission itself, rather than the conduct of the private defendants. Thus, Heinrich argues, it is irrelevant that the private defendants are considered independent contractors for purposes of the Federal Tort Claims Act as he seeks to recover for the negligence of the Commission employees themselves.

Heinrich argues that this case most closely resembles *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), in which the Supreme Court held that the United States was a potentially liable party because it had specific duties to ensure that certain polio vaccines complied with regulatory standards, even though independent contractors sold and administered the vaccines. That decision, however, involved an argument that the United States should not be liable under the Federal Tort Claims Act

due to the discretionary function exception. *See id.* at 534, 108 S.Ct. 1954. The Court determined that under applicable regulations, the National Institute of Health had no discretion to issue licenses for noncompliant vaccines. *See id.* at 546, 108 S.Ct. 1954. In contrast, the present case involves a claim that private defendants conducted experimental procedures for which the potential therapeutic benefit was outweighed by potential risks and for which no informed consent was obtained. The involvement of the United States occurs *only* with respect to its alleged failure to exercise adequate oversight. Thus, the cases decided on the independent contractor defense are the more pertinent cases, not *Berkovitz*.[2]

Heinrich also argues that the independent contractor determination should be made at a high level of generality: "[T]he issue is not whether [Mass General] and MIT were independent contractors as to all of their activities, but whether as to the particular portion of their conduct which is the subject of this litigation they were functioning as independent contractors." Heinrich Opp. at 11 (citing *Ferguson v. United States*, 712 F.Supp. 775 [N.D. Cal.1989]). Thus, Heinrich believes that the pertinent issue is whether the United States controlled "the overarching determination to pro-

2. The same problem plagues Heinrich's reliance on the case of *Andrulonis v. United States*, 952 F.2d 652 (2d Cir.1991). In that case, the Second Circuit addressed a situation in which a federal government scientist from the Center for Disease Control neglected to warn fellow scientists and lab technicians about the dangerous nature of a rabies viral strain used in an experiment. *See id.* at 653. "The government's liability was based on a finding that [the government doctor] had a duty to warn about the obviously dangerous conditions he should have noticed in the laboratory when the rabies virus he had supplied was being used." *Id.* The Second Circuit held that the discretionary function doctrine did not insulate the government from liability because "[n]othing indicates that CDC policy required, or even encouraged, [the government doctor] to ignore unsafe laboratory conditions and thereby unnecessarily place the

lives of laboratory workers at risk in order to further a scientific cause or any other objective of the government." *Id.* at 655.

While this language might at first seem highly relevant to the present case, a critical factual distinction exists. The government doctor in *Andrulonis* was present during the conduct of the experiment. Thus, the doctor's failure to object to the obviously negligent manner in which the experiment was conducted constituted *primary* government conduct upon which Federal Tort Claims Act liability could hinge. In the instant case, no such government conduct is present. Instead, the Commission's involvement was entirely passive—providing funding, approving research proposals, and monitoring results. In that passive posture, the pertinent issue is not the discretionary function doctrine, but the independent contractor defense.

ceed with BNCT ... when there was no basis to believe that therapeutic value existed or that it outweighed the risks." *Id.* The credible evidence reviewed above, however, demonstrates that, even with respect to the more general determination to pursue BNCT, the United States was not sufficiently dominant over the private defendants to avoid application of the independent contractor doctrine. The Commission had a general directive from Congress to enlist private researchers to help develop peaceful uses of atomic energy. BNCT was one of the unfortunate consequences of that national agenda. It was not, however, the result of detailed supervision or day-to-day control by the Commission.

III. *Conclusion*

Because "[t]he Federal Government in no sense control[led] 'the detailed physical performance' of all the programs and projects" of the private defendants, *Orleans,* 425 U.S. at 816, 96 S.Ct. 1971, the United States cannot be held liable under the Federal Tort Claims Act for the alleged negligence of the private defendants. Thus, the United States' motion for judgment is ALLOWED.